UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| BENJAMIN PEREZ-NUNEZ,<br>  By his Mother and Guardian,<br>  Jessica Perez | ) ) ) | |
| | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | Case #1:26-cv-985 |
| | ) | |
| JOHN RAMOS,<br>c/o Royal Security Agency<br>4717 Anderson Street<br>Woodbridge, VA 22193 | ) ) ) ) | COMPLAINT |
| | ) | |
| and | ) | |
| | ) | |
| ROYAL SECURITY AGENCY, LLC,<br>Serve: Republic Registered Agency, LLC<br>     2807 North Parham Road, Suite 320<br>     Henrico, VA 23294 - 4410 | ) ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| KEVIN YUN,<br>c/o Food Star International<br>5521 Leesburg Pike<br>Falls Church, VA  22041 | ) ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| 5521 LEESBURG PIKE, INC.,<br>d/b/a Food Star International<br>Serve: Young Nam Chun, Registered Agent<br>     7816 Swinks Mill<br>     McLean, VA  22012 | ) ) ) ) ) | |
| | ) | |
|      Defendants. | ) | |

Preliminary and Jurisdictional Statement

1.  Plaintiff Benjamin Perez-Nunez (hereafter "Ben") is a yong man with severe autism who, while peacefully shopping in a supermarket with his mother and brothers, was violently and without cause attacked by a security guard who had a history of violence and abuse.  Acting by his mother, his duly appointed guardian for purposes of this litigation, Ben now sues the security guard, the guard's employer, the store manager who directed the guard, and the company for which the store manager worked, for the severe physical, emotional and financial injuries he suffered at the guard's hands.  This Court has jurisdiction under 28 U.S.C. §1332, the parties being of diverse citizenship and the amount in controversy exceeding $75,000 exclusive of interest and costs.

Parties

2.  Plaintiff Benjamin Perez Nunez is a twenty year-old young man with severe autism. He lives with his father in Bowie, Maryland.  He is 5'7" tall and weighs around 155 pounds.  He sues via his mother Jessica Perez, who as of June 6, 2025, has been duly appointed his guardian by the Arlington County, Virginia, Circuit Court.

3.  Defendant John Ramos was, at the time of the assault giving rise to this action, a security guard employed by defendant Royal Security Agency LLC and working at the Food Star International Supermarket ("Food Star"), owned by defendant 5521 Leesburg Pike, Inc.  He is 6'2" tall and weighs around 230 pounds.  Mr. Ramos' conduct at Food Star here at issue was in the course of his employment by, and in furtherance of the business of, his employer Royal Security.  On information and belief he is a resident and citizen of Virginia.

4. Defendant 5521 Leesburg Pike, Inc. ("5521") is a Virginia corporation. It owns and operates the Food Star International supermarket of which its employee defendant Kevin Yun was manager.

5. Defendant Kevin Yun was at all relevant times an employee of defendant 5521 and manager of Food Star, the supermarket owned and operated by that company. At all relevant times, Mr. Yun was responsible for and managed the supermarket's operations. He had and exercised authority to direct security employees such as Mr. Ramos to address such security concerns as he believed required attention. His actions here at issue were in furtherance of the business of his employer 5521. On information and belief he is a resident and citizen of Virginia.

6. Via defendant Yun, defendant 5521 directed and controlled Mr. Ramos' work at Food Star, including his actions here at issue. Mr. Ramos thus served as a borrowed servant of defendant 5521, acting pursuant to direction of 5521 personnel and in furtherance of the business of defendant 5521.

7. Defendant Royal Security Agency, LLC ("Royal Security") is a Virginia corporation providing security services. At all relevant times it employed defendant Ramos.

Claim for Relief

The Hiring and Retention of Defendant Ramos

8. All private security firms operating in Virginia must be licensed by the Virginia Department of Criminal Justice Services ("DCJS"). Defendant Royal Security is such a

company, possessing DCJS license number 11-18929.  In order to be so licensed, a firm's personnel employed as security guards must also be individually licensed by DCJS.

9.  Under Code of Va. §9.1-139(K), no person with a criminal conviction for, inter alia, assault and battery can be employed as a registered or certified employee by a private security services business, or issued a private security services registration, certification as an unarmed security officer, or a private security services business license.

10.  At this writing it is unknown if Mr. Ramos had any convictions for assault or battery. It is known, however, that prior to May 2024 he had a criminal history of multiple arrests for domestic violence and assault in various Northern Virginia jurisdictions and the state of Colorado.  He was also convicted in Fairfax in 2016 of going 99 MPH where the speed limit was 55 MPH.  The record of these offenses was publicly available on line and readily available to any third party, including Royal Security that hired and retained him as a security guard.

11.  Royal Security either did not bother to check Mr. Ramos' public criminal record, or, having checked it, ignored his repeated arrests for domestic violence and assault, or took no steps to be reasonably satisfied that Mr. Ramos had proper control over his demonstrated aggressive tendencies and could reasonably be trusted to serve as a security guard.

12.  In addition to his violent past, four months before his assault on Ben Mr. Ramos was involved in a recorded use of excessive force at another northern Virginia  business for which Royal Security provided security services.  On January 9, 2024, the owner of that business wrote to Royal Security as follows:

> The fact that batons keep getting used in situations where your team is the aggressor and the first to get physical with unarmed patrons is a very scary trend. The culture that some of your guards have created has done serious damage that I know does not represent you personally but it does represent your company. With that we are terminating your services immediately.

13.  Despite Mr. Ramos' confirmed pattern of aggressive and violent behavior that caused Royal Security to lose a customer, the company retained him as a security guard and did so without effectively training or supervising him.   Mr. Ramos thus continued working for the company, providing security services at Food Star.

Mr. Ramos' Assault on Ben and its Consequences

14.  On May 9, 2024, Ben accompanied his mother Jessica Perez, as he normally did, as she attended to her weekly grocery shopping at Food Star.  His two younger brothers accompanied them.

15.  While at the store, Ben had to use the bathroom.  He told his mother, as he always does, that he had to  use the bathroom, which the store makes available to its patrons.  He had previously done so on shopping trips with his mother, without incident.  He secured the bathroom key from the store's service desk, used the bathroom, returned the key, and rejoined his mother, all without incident.

16.  That day, Ben's mother had a substantial amount of shopping to attend to. Approximately half an hour after he had first used the bathroom, Ben, who suffers from incontinence, needed to use it again.  Once again he so informed his mother, secured the bathroom key from the service desk without difficulty, and used it to enter the bathroom. There he entered a stall, lowered his pants and sat on a toilet.

17. Defendant Yun became aware that Ben had entered the bathroom. He incorrectly and baselessly decided that Ben was not a patron of the store and might be using the bathroom for an inappropriate purpose such as – he later claimed – smoking (sic). Based on these assumptions, and without any attempt to check if they had any basis in reality, Mr. Yun directed Mr. Ramos, then on duty as security guard, to remove Ben from the bathroom.

18. Ben, his mother and his brothers were at all times business invitees of defendant 5521's. Defendant 5521 and defendant Yun, as 5521's manager and agent in charge, and defendant Ramos, as borrowed servant and agent of defendant 5521, were under an affirmative duty to use reasonable care to safeguard the persons and well-bring of Food Star patrons, including Ben.

19. In response to his instructions from Mr. Yun, Mr. Ramos went to the men's bathroom, unlocked the outer door, and entered. Upon entering, he saw that a person – Ben – was in an occupied and locked stall. There was no smell of smoke, nor other indicia that Ben was using the facility for any improper purpose. As a result of his poor training or lack of training, Mr. Ramos did not report back to Mr. Yun that nothing was amiss. Instead, he undertook woodenly to follow the orders he had received from Mr. Yun, as he had been trained to do.

20. Notwithstanding the fact that Ben manifestly appeared by all evidence to have a valid purpose for using the bathroom, Mr. Ramos proceeded to bang on the door of Ben's stall. Without identifying himself as a security guard for the store, he ordered Ben out of the stall.

21. Ben did not know Mr. Ramos and did not know who was banging on the door of his stall. He found Ramos' remarks to him weird, inappropriate, and frightening, particularly because some years before he had been verbally sexually abused in a bathroom of the specialized school he had been attending as a student with autism. Ben responded to Mr. Ramos in fear and anger, refusing to exit and telling him to go away and leave him alone.

22. Mr. Ramos responded by again ordering Ben to come out, again without identifying himself as a security guard. When Ben said he would call the police if the man did not leave him alone, Mr. Ramos responded that he was "above" the police, and threatened to beat or shoot Ben.

23. Mr. Ramos thereupon kicked at the stall door, causing the sliding locking mechanism to open. He observed Ben sitting on the toilet with his pants down. Ordering Ben to leave, he grabbed Ben by the shoulders and tried to yank him out of the stall. Ben pulled back and was able to slam the door closed. He pulled up his pants and tried to call for help.

24. Mr. Ramos now kicked the stall door off its hinges and entered the stall. Finally telling Ben he was a security guard, he grabbed Ben and forcibly undertook to eject him from the stall. Ben, now terrified and uncomprehending, flailed out in resistance, hitting Mr. Ramos in the face as he did so. Infuriated, Mr. Ramos punched Ben repeatedly in the face and head, pounded his head against the wall, threw him to the ground. He then lifted Ben up and walked him out of the bathroom, bleeding from his face.

25. Ben was severely physically injured by Mr. Ramos' assault. Upon departing Food Star, Ben was taken by ambulance to Fairfax Hospital, where he received emergency care for his mouth and multiple stitches to his face and head resulting from Mr. Ramos' attack. Exhibit 1 depicts Ben before he was cleaned up by a nurse. One of his teeth was chipped and loosened by

Mr. Ramos' blow to his mouth. The substantial physical injuries to his face and mouth dramatically exacerbated his extreme emotional trauma at what had occurred.

26. The actions of Mr. Ramos were unjustified, intentional, reckless, outrageous, and intolerable. Alternatively, they were grossly negligent. In either event, they inflicted severe physical injury and severe emotional distress on Ben, a person with severe autism.

27. When Mr. Ramos paraded Ben bleeding from his face and mouth, out of the bathroom into the store, Ms. Perez, horrified, asked him for an explanation. With Mr. Yun standing close by, Mr. Ramos responded that Mr. Yun had directed him to remove Ben from the bathroom. When Ms. Perez explained that Ben was autistic, Mr. Ramos said it didn't matter.

28. Mr. Yun expressed no qualms or chagrin at what had occurred. He did not reprimand Mr. Ramos. He said that if Ben was autistic, Ms. Perez should have accompanied him to the bathroom. While Mr. Yun said he had ordered Mr. Ramos to remove Ben from the bathroom because some youths entered the bathroom to smoke, he did not inquire if Ben had been smoking, and apparently did not care. Mr. Yun told Mr. Ramos to take Ben out of the store because "customers are observing the situation."

29. Mr. Ramos escorted Ben out of the store as directed. When Ms. Perez approached Ben in an attempt to calm and comfort him, Mr. Ramos yelled at her to stand back.

30. In a deliberate effort to "flip the script" and avoid liability for his assault on Ben, Mr. Ramos called the police and pressed charges against him for assault. He did so not to enforce obedience to the law, but to avoid the consequences of his own reckless actions. His accusation was without probable cause and malicious, given that Ben's striking him in the face – which Ben

never denied having done – was done in instinctual and desperate self-defense as Mr. Ramos hauled him off the toilet in an outrageous abuse of power.

31. After having been taken by the police to the hospital for emergency care, Ben was brought before a magistrate where, based on Mr. Ramos' accusation, he was charged with assault. He was released pending his assigned court date. Ben's parents retained and paid for criminal defense counsel, who secured the dismissal of the charges against Ben his first court appearance.

32. As a result of his beating by Mr. Ramos, the resulting cuts to his face and head requiring stitches, and a tooth loosened by a blow from Mr. Ramos, Ben, an emotionally fragile individual, suffered immense emotional and psychological harm, including post-traumatic stress disorder. He regressed substantially from the advances he had made over a period of years in contending with his autism.

33. From May 2014 to November 30, 2023, Ben had attended the Harbour School at Annapolis, a school specializing in serving students with special needs, where he had been slowly but successfully developing his social, intellectual and academic skills, to the point that when the family moved to Virginia in 2023, Ben enrolled in Yorktown High School in Arlington under an individualized education plan ("IEP").

34. In the wake of Mr. Ramos' attack, Ben, traumatized, was unable to continue going to school. His Yorktown High School IEP was modified to provide for home-based services for the balance of the 2023-24 school year. His parents sought to re-enroll him the following year at the Harbour School where he had previously made so much personal progress. The school,

however, informed his parents that he had regressed to the point that it was no longer able to meet his needs, and declined to re-enroll him as a student.  The school wrote:

> We have identified that he requires a more therapeutic school setting than we are able to provide based on his recent Post Traumatic Stress Disorder (PTSD) diagnosis. The Harbour School is not a therapeutic school setting, as our primary focus is academic and instructional. As a result, we are not able to provide the level of support that Benjamin requires.

35.  After spending several months in a special education program run by a local public high school, Ben enrolled in the Kennedy Krieger High School in Baltimore, a school that specializes in the education of children with autism and other developmental disabilities.  He had someone with him at all times, and used a private bathroom to which he was accompanied by someone who waited for him outside.  He stopped attending school in May 2025 due to his PTSD.  It is not anticipated that he will finish his high school education.

36.  As a result of Mr. Ramos' attack, Ben was severely physically injured.  His face was severely beaten and he was left bleeding from his mouth, requiring stitches near his eye, and with one chipped and loosened tooth.

37.  Ben was severely injured mentally and emotionally by Mr. Ramos' attack.  His autism greatly elevated the adverse consequences of this abuse, which continue to plague him to this day.  He experienced, and to this day continues to experience,  intense fear of being in public without one of his parents.  He cannot use a bathroom in a public place without being accompanied.  He acquired an extreme fear of uniformed personnel, including but not limited to police officers.  He has experienced suicidal ideation as a result of the assault.  He has required, and obtains, extensive counseling and therapy to address his post-trauma condition.  At the recommendation of his therapist, Ben obtained a service dog to help ease his fear and anxiety

when he leaves his home.  These profound and debilitating emotional and psychological consequences, manifesting a dramatic set-back from the gains he had made prior to Mr. Ramos' assault, are ongoing.

38.  Ben and his family have been put to substantial expense to deal with the consequences of Mr. Ramos' attack.  These include significant expenses for medical and mental health care, expenses relative to securing Ben's service dog, and other expenses.[1]

## Causes of Action

### Count I(a): Assault and Battery (John Ramos)

39.  By reason of his actions set forth above, Mr. Ramos is liable to Ben for assaulting and battering him.

### Count 1(b): Grossly Negligent Performance of Security Duties

40.  In the alternative to Count I(a), Mr. Ramos grossly negligently discharged his duties as security guard, causing severe physical and mental injury to Ben.

### Count II:  Malicious Prosecution (John Ramos)

41.  By baselessly, maliciously, and without probable cause causing Ben to be  charged with assault and requiring Ben to defend himself successfully against that charge, Mr. Ramos is liable to Ben for malicious prosecution.

---

[1]While Ben seeks damages for Mr. Ramos having chipped and loosened his tooth, he makes no claim here for the dental work done on his teeth thereafter.

Count III(a): Intentional Infliction of Emotional Distress (John Ramos)

42.  Mr. Ramos' wholly unjustified and aggressive intrusion on Ben – a young man with autism sitting with his pants down on a toilet in a conventionally private space where people attend to their private bodily functions – followed by his assault and battery upon Ben as set forth above, was intentional, reckless, outrageous, intolerable, and calculated to inflict severe emotional distress on any subject thereof, to say nothing of a person, like Ben, with severe autism, for whom the consequences of Mr. Ramos' recklessness and violence were immense in setting him back emotionally, psychologically, and academically as set forth above.   By reason of his actions at issue Mr. Ramos is liable to Ben for intentional infliction of emotional distress.

Count III(b): Grossly Negligent Infliction of Emotional Distress (John Ramos)

43.  In the alternative to Count III(a), Mr. Ramos' grossly negligent infliction of physical and mental health injury on Ben while discharging his security duties, as set forth above,  led, by a clear and unbroken chain of causal connection, to severe emotional and psychological distress on Ben's part as set forth above.  By reason of his actions at issue Mr. Ramos is liable to Ben for grossly negligent  infliction of emotional distress.

Count IV: *Respondeat Superior* - Ramos (Royal Security and 5521 Leesburg Pike, Ltd.)

44.  The actions of Mr. Ramos set forth above were all performed while he was acting on behalf of his employer Royal Security and within the scope of that employment.  They were also performed on behalf of 5521 Leesburg Pike, Inc., for whom Mr. Ramos was a borrowed servant.

Pursuant to the theory of respondeat superior, Royal Security and 5521 Leesburg Pike Inc. are each liable to Ben for each of Mr. Ramos' torts set forth herein.

### Count V(a): Negligent Hiring  (Royal Security)

45.  As set forth above, Royal Security either knew or should have known by reasonable inquiry of Mr. Ramos' propensities for violence that posed a threat of injury to those he foreseeably confronted as a security guard when it initially hired him.  The company's negligent hiring of Mr. Ramos was a proximate cause of Ben's victimization at Mr. Ramos' hands as set forth above, rendering the company liable to Ben for its negligent hiring retention of Mr. Ramos.

### Count V(b): Negligent Retention (Royal Security)

43.  This claim is in the alternative to Count V, in the event discovery reveals that Royal Security learned of Mr. Ramos' propensities for violence that posed a threat of injury to those he foreseeably confronted as a security guard only after he engaged in such aggressive violence as to cause one of Royal Security's customers to cancel its contract with the company.   In that event, and as set forth above, the company's negligent retention of Mr. Ramos was a proximate cause of Ben's victimization at Mr. Ramos' hands as set forth above, rendering the company liable to Ben for its negligent retention of Mr. Ramos.

## Count VI: Negligent Training (Royal Security & 5521 Leesburg Pike, Inc.)

46.  Royal Security and 5521 Leesburg Pike Inc. were both aware that security guards will foreseeably confront third parties in the course of their work, including when a third party may have to be prevented from, or detained for, engaging in unlawful activities.  They knew or should have known that in order to ensure that a guard's security work be carried out with due regard to the rights and safety of the public, the guards had to be properly trained to distinguish apparently suspicious from manifestly innocuous behavior of third parties, to seek appropriate guidance if a situation appeared ambiguous, and in any event to use only such force, if any, as was appropriate to secure the desired end.  But both Royal Security and 5521 Leesburg Pike negligently failed sufficiently and properly to train Mr Ramos in the performance of his duties, leading to his assault and battery on Ben set forth above.  Their failure to provide appropriate training to Mr. Ramos was a proximate cause of his assault and battery on Ben set forth above, rendering both companies liable to Ben for their negligent training of Mr. Ramos.

## Count VII(a): Intentional Infliction of Emotional Distress (Kevin Yun)

47.  Mr. Yun, who after the fact expressed no chagrin at what had occurred, did not reprimand Mr. Ramos, and apparently did not care that Ben had not been smoking in the bathroom, nevertheless ordered his security guard to evict a peaceful, law-abiding patron from the store bathroom where he had gone to relieve himself. Mr. Yun's action was intentional, reckless, outrageous and intolerable, and the consequences thereof caused Ben severe emotional distress.

-14-

<u>Count VII(b): Negligence (Kevin Yun)</u>

48.  In the alternative to Count VII(a), Mr. Yun's decision to order Ramos to remove Ben from the bathroom at Food Star, as set forth above, reflected his baseless and ignorant assumption that Ben was not a patron of the store and was using the bathroom for an improper purpose.  Mr. Yun's failure to seek and obtain accurate appropriate information before directing Mr. Ramos to oust Ben from the store bathroom was grossly negligent, rendering him liable for the significant injuries to Ben inflicted by Mr. Ramos.

<u>Count VIII: *Respondeat Superior*- Yun (5521 Leesburg Pike, Inc.</u>

49.  The actions of Mr. Yun set forth above were all performed while he was acting on behalf of his employer 5521 Leesburg Pike, Inc.  Pursuant to the theory of *respondeat superior*, 5521 Leesburg Pike Inc. is liable to Ben for Mr. Yun's torts set forth herein.

***

Wherefore, Ben seeks an order granting him:

* an award of compensatory damages against all defendants, jointly and severally, in an amount appropriate to the proof at trial;

* an award of punitive damages against all defendants, in amounts appropriate to the proof at trial;

* an award of his costs; and

* such other relief as is just.

Ben requests trial by jury.

-15-

Respectfully submitted,

BENJAMIN PETER-NUNEZ,
  By his Mother and Guardian, Jessica Perez,

By counsel

Dated:   April 10, 2026

Counsel for Plaintiff:

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
(703) 684-1100 / Fax: 703-684-1104
vmg@robinhoodesq.com
**Perez-NunezAssault\Pleadings\2026-0410-Complaint**

//s// Abigail S. Grand
Abigail S. Grand, #100578
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
(703) 684-1100 / Fax: 703-684-1104
agrand@robinhoodesq.com